We have three arguments to be heard today. The first is number 2009-1091, Smith & Nephew v. Arthrex. Mr. Saber, you're reserving five minutes for rebuttal? Yes. Okay, well when your yellow light goes on you will be starting into your rebuttal time. May it please the court, my name is Charles Saber from Dickstein Shapiro and I'm here on behalf of Appellant Arthrex. Time permitting, I would like to discuss three issues with the court today. The first is the claim construction on resilience, where we believe the court erred by requiring that resilience merely contribute in part to the lodging of the anchor in the bow. This faulty construction allowed the jury, we believe, to find infringement on a device which simply does not have the resilience required by the claims. The second issue we'd like to discuss is double patenting. In Smith & Nephew's effort to defend the district court's contribution in part construction, Smith & Nephew now contends that the lodging under the 557 patent does not occur until after the so-called surgeon's tug on the suture. While we believe that Smith & Nephew's effort to defend its claim construction is dead wrong, and we will talk about that in a bit, if it were correct, then it must lead to a conclusion of double patenting. What about under your construction? We believe that there's actually double patenting under our construction as well, Your Honor, because we believe that actually there is lodging in the 422 patent simply by pressing it in the hole, and I'd be obviously prepared to discuss that. But the point that I wanted to make here is that as Smith & Nephew is trying to now construe 557, that the lodging doesn't occur until after the surgeon's tug, there's no question, even Smith & Nephew concedes that there's lodging in 422 after the surgeon's tug. It's one and the same, and that's why we believe that if the court were to accept Smith & Nephew's construction of 557, there must be double patenting. The third issue that if I have time I'd like to briefly discuss is the obviousness issue, the combination of Perthes and Bergio, a defense which the district court dismissed on summary judgment. As we will show, there is no doubt we believe that Bergio provides every limitation of the claims arguably missing from Perthes, particularly the main issue, which is lodging the membrane bone through resilience. On that third issue, as I understand the posture, the district court granted summary judgment essentially because he said some of the limitations were not present in the prior art. Is your to find that to be incorrect, that we should order summary judgment of obviousness, or that you would have to have a trial, for example, to address issues such as motivation to combine? Actually, I think that the record action here would be clear that this court could enter judgment because I believe that the teaching in Bergio about how it's on figure 13 of how it's lodged in the bone is so clear that I think that the— Well, that may be true, but that's a patent on implanting electrodes rather than surgical sutures. So, you know, in order to find obviousness, presumably there has to be some sort of motivation to combine. That wasn't addressed in the summary judgment decision, but wouldn't that be a question of fact that would have to go to the jury? You are absolutely correct, Judge Dyke, that it was not addressed in the summary judgment decision. I don't think there was really a dispute about that because we are talking about surgical devices here, and I think your description of Bergio is absolutely correct, but the key element is they're both surgical devices that are implanted into bones in the body. So I think that's why there really wasn't a debate about whether this was about motivation to combine, but certainly at a bare minimum, and that's why I think judgment could be entered, but at a bare minimum, if the court believes it would be appropriate, then you're correct that at least to have the judge look at it in a trial if necessary would be appropriate, though as I say, I think that we could have judgment entered under the facts of this case. Let me turn, if I could, to the resilience question, the claim construction issue. Could you show us what instruction specifically you asked the district court to give you on this point? It's in the, it was during the claim construction, it's a little difficult to actually, I don't have the page right here. Well, the necessary shows up at 23-9-21. Right. And then that carries on to 23-9-37. That's correct. And 23-9-38. Right. Your sufficient, I take it, wasn't raised in the jury instruction connection, but rather at the Markman claim. That's exactly correct. And you say it was preserved by virtue of having been raised at Markman. That's correct. That's correct, Your Honor, and I don't think there's any dispute about that in this case. That was, in the sufficient was what was requested at Markman. You mean there's no dispute that it was raised? That is right. No dispute that it has been waived by virtue of not having been reiterated at the jury charge conference. There's a question I know about waiver because of what happened at the JAMAL that Smith and Nephew has raised, and they say, well, you didn't raise it in the JAMAL, so therefore you can't go with sufficient now. They don't contest that we raise sufficiency at the claim construction stage, and frankly I think the law is very, very clear that there is no requirement to re-raise the claim construction that was already rejected early on in the case. Well, I wasn't really asking you the question because I was concerned about the failure to satisfy Rule 51. I was really asking because I wanted to see exactly what the claim construction was that you proposed. I found sort of descriptions in the record of what you thought should be added to the claim construction. I didn't find specific language. It was during the claim construction hearing. I know we cite to it in our brief. If you could just give me a moment. I don't mean to take up. I'll get back to that in my rebuttal if that's okay, Your Honor. But I know we cited to it in the brief where in the claim construction hearing that we raised the sufficiency as the appropriate claim construction. You raised it. I found where you raised it. What I didn't find was sort of what the exact language was that you wanted. Yeah. It was on that page and it was kind of in the briefs as well, but it was particularly at the claim construction hearing where we certainly described that this was a patent about resilience being sufficient to lodge by itself, which of course I know there was this little side issue of, well, you're saying it's the only thing. Of course, that's not what they were saying, but that it has to be sufficient by itself to be able to lodge. Again, on that issue, we think the patent is clear that that is exactly what is going on here. This is a patent about, or at least this aspect of the patent, is about lodging an anchor in the bone hole. And what's described there are the resilient legs that get compressed and then expand out when it's pressed in. And Arthrex's products just simply don't work that way. So what happened to make an infringement claim is we believe that Smith and Neshew obtained a faulty claim construction, which said that resilience need only contribute in part to the lodging. And that's how Smith and Neshew tried the case. Their own expert said right at the beginning of his testimony, substantive testimony, they said that for the amount of resilience needed to prove infringement, and I quote, all it has to is contribute some small part. It just has to contribute some small part. He said it twice. That's why we're here to try and correct that claim construction. And we believe that this patent is crystal clear that resilience and resilience alone is the only factor disclosed to lodge the anchor in the bone hole. Disclosed or claimed? Well, it's claimed. And then because of the claim is, of course, lodging the membrane bone. And the description from the patent, of course, that does that is just resilience. Well, I read the patent specification as including. I mean, there are about four references, I think, in the two columns. I guess it's nine and ten or thereabouts. That's correct. That four different descriptions, two of them seem to include the surgeon's tug and two of them don't. And they refer alternately to securing, anchoring, and in one case, lodging. And I think the one that refers to lodging actually does refer also to the surgeon's tug, if I'm not mistaken. Am I wrong about that? You are correct, of course, Your Honor, that there are several embodiments that are shown. What about the cartilage collapsing around the anchor? Excuse me, Your Honor? I think there's some reference to the cartilage collapsing around the anchor than it says the suture is now anchoring. Right. I think that's the earlier part of the patent. This is really columns nine and ten, I believe, where we're talking about the various embodiments that are about lodging the anchoring bone. Well, here's the language I was focusing on. Sure. This is at column nine, 56 through 60. As a result, tension in the suture, that's the surgeon's tug, in conjunction with the intrinsic resilient force of the anchor member that forces the legs apart, tends to lodge the edges of the anchor members beneath the cortical layer. That seems like it's talking about both. Right. They both contribute. So that's a disclosure of something other than mere resilience, correct? Without question, without question, that once the surgeon tug comes into play, something else is at issue. No doubt about that. You've got to remember, we're not dealing on a blank slate here. This court, as the court knows in the Ethicon case, dealt with this very issue of lodging the anchor in bone. And when that occurs, this court could not have been clearer that the time that they looked at is by pressing. In fact... The surgeon's tug is optional. Well, the surgeon's tug, which is something that comes afterwards, this court was clear that lodging by pressing meant that the anchor had to be lodged merely by pressing. And if you had to do the surgeon's tug, then you weren't within the claim. The surgeon's tug was something that was optional that could happen later, but it wasn't part of the lodging by pressing. That was the holding of this court. And I think everyone accepts that that's the holding of this court. And Smith and Nephew does two things. First of all, they now agree that at that stage, at the lodging by pressing stage, the only force that's at work in the patent is resilience. They concede that, page 18 of their brief. But they say, well, now, even though the Federal Circuit in Ethicon ruled that the time for lodging is when pressed in, and even though resilience is the only factor at work during that time, somehow Judge Mossman changed the time for lodging from the time of pressing to a time after the surgeon's tug. And the reason that they do that is because that's the only way they can try and say something other than resilience is at work. Your Honor, we submit that there is absolutely no reason, no reason at all to conclude that somehow the time of lodging changed. First of all, Judge Mossman can't change what this court did. And he didn't change what this court did. He specifically told Smith and Nephew, no, I'm doing exactly what the Federal Circuit did. This Federal Circuit, this is the language about being ready to secure tissue. The Federal Circuit never took that footnote out of Judge Hubel, the magistrate from Ethicon who originally put it in, equated lodging from pressing with being ready to secure tissue at the same time. Nothing got taken out. In looking at the specification, do you think that there are three different verbs that are used to describe what looked to me, at least, to be the same phenomenon. One is lodge, the other is secure, and the third is anchor. Do you regard those as equivalent? Absolutely the same, Your Honor. And we don't need to go beyond the claim to know that. Because Claim 1 says a method for anchoring in bone a member and attached suture. And then one of the steps that it requires to go down to the third step is lodging. So lodging and anchoring are exactly the same. Secure, I know, is another word that's in there, but lodging and anchoring are exactly the same, without question. And in fact, while we're on the claim language, that's a complete answer to Smith and Nephew's argument here. The claim language tells us what the time for lodging is, just like this court said. It's lodged when you press. And again, admitted now, lodged when pressed just means the time for, just means when you're putting it into the bone, and resilience is all that's at work. So their argument is inconsistent with the claim language. It's inconsistent with this court's description of what's going on here. This court talked about the surgeon's tug, just like the specification does. And this court said, just like the specification does, it's a cautionary safeguard that can be done after lodging occurs to make sure that lodging has already happened. There is not a word in this court's opinion  that says that the lodging doesn't occur until after the surgeon's tug. That's what this court ruled in Ethicon and nothing has changed. Their whole argument is somehow that footnote came out. That footnote that Judge Hubel had said, therefore lodging means being ready to secure tissue. Judge Mossman included that footnote as he explained, because the Federal Circuit never took it out and it's exactly the same thing as lodging by pressing. It's that time. In fact, at 0048, if you read the entirety of Judge Mossman's construction, he's talking exactly as the Federal Circuit did about how you lodge when you press it in and there can be more movement, that's okay, but it has to be necessary to lodge simply by pressing. That's the answer. And since it's conceded, Your Honor, that lodging by pressing when it goes in is only resilience. Sufficient is really what you meant there, not necessary, right? Well, the court used the word necessary because it's a slightly different situation the way they're describing it, but it really means the same thing. You have to be able to lodge at the same time. You have to be able to lodge just by pressing, which is what this court was talking about in Ethicon. And then the specification says that the only thing that worked to do the lodging is resilience. That's our main point. I see I'm running a little low on time, so I'd like to reserve. You're right. Well, you actually exhausted your time, but we'll restore your full rebuttal time. I appreciate it. Thank you, Your Honor. Mr. Skinner. May it please the court. I'm going to start on a little different point than my colleague did in his remarks, and basically it is what is really the most important issue on the appeal, and that is whether or not the denial of the JMLL motion was correct under the Ninth Circuit standards. And I think the reason I want to focus on that is because in this case, the actual trial evidence of infringement, which Arthrex completely ignores in its brief, is such, and which the jury accepted, is such that it proved infringement under the district court's construction, under the construction that Arthrex urged before the retrial and in its JMLL motion. Well, it might have. It might have if all your witnesses were believed, but the problem is that you argued and your witnesses testified that a minor contribution was sufficient. I've read those references. There are quite a few of them. So it's possible, is it not, that if they're right about the claim construction, that it was prejudicial error that the jury could have ruled against you under those circumstances? I don't think so when you consider what the actual evidence was. The testimony that they're talking about is only that, when we talk about infinitesimal here, that only comes up one place, and that is in the testimony... I think you got a hard road to hoe on that one. I've read those references, and that seemed to be a pretty consistent theme that it could be very minor and still infringe. And maybe you didn't need to argue that, but you did. Well, what we actually argued and what we actually presented at trial and what we argued in closing was that there is substantial holding power, lodging power of their anchors caused by their resilience. And that's what we relied on, and that's what supported the verdict here. And if that wasn't so... Do you agree that you argued that only a minor amount was necessary? No, what we argued was that there was no mathematical or cut-off required by the judge's construction. Hayes says it only has to contribute in some small part. There was this discussion in Hayes' direct about Newton's third law being sufficient. And then Hayes on cross was asked whether 100% is enough. He seems to say that it is, and, you know, it just goes on and on. But that wasn't the evidence, Your Honor, that we introduced. The evidence of the holding power of their anchors... And one of the things I have to apologize for was because we didn't put it in either brief, is exactly what the size of these anchors are. We showed pictures, but literally, if you sharpened a number 2 pencil, the size of the anchor is about the same size as the exposed pencil tip. That's how big these are. And what the testimony was was that our series of tests proved the following. That their anchors, without question, when pressured, compressed, and they returned at least partway to their original position. The next thing we proved is that when you inserted those through a hole in the bone, a small hole in the bone that they require, the anchors compressed and then expanded out again. And then what we did was did measurements of that, showing that, without question... The measurements were disputed, right? Well, they were disputed, but as a practical matter, under the Ninth Circuit standard, it cuts in our favor. They can't come in here and have this court sit as a new finder of fact. No, no, but what I think Judge Dykes' questioning is predicated on the notion that the jury was, if the jury was given incorrect instructions, was the evidence so overwhelming that, in effect, the incorrect instructions get washed out as harmless error. I think that's exactly so, if the instructions were incorrect. But you can't then import all the law about how this court can't make factual findings because this court is inherently then cast in the role of trying to decide whether the evidence was so overwhelming in your favor that the jury instructions, incorrect as they might have been, were harmless. In that respect, that's correct. And that gets to the last piece of evidence that I want to talk about on this, and that's evidence from Arthrex itself and their expert, Dr Alan Tenser, whose name is never mentioned in any of their briefs here. And they set him the task of trying to establish just how much holding power or lodging force was directly attributable in their anchors to the resilience in the anchors. And he formulated a test where he removed all the other variables by comparing steel anchors of the same size and shape with their actual plastic ones. And his measurements came out bad for Arthrex. Does your focusing on the harmless error argument suggest that you agree that there was an error? No, I do not. The judge ruled that contributing in part here is what was required. I think that is consistent with the patent, which it doesn't say when you get down to being ready to attach tissue to the bone exactly how much holding power is attributed to the resilience, the spreading out of the device, or the barbs digging in. So it contributes in part, and that's consistent with the specification. So I don't think the instruction was an error, particularly since the judge made it absolutely clear in summary judgment that he would not allow just inherent resilience, a small, tiny amount of resilience, to meet that requirement. And if he thought that was what our evidence was, he would have granted them JMOL of non-infringement. Well, but I think the appellant's point is the judge was very sensible on the things he said until he got to the point of jury instructions, and then he gave you more than you were entitled to, and you happily took it, despite the fact that you then, as frequently happens in these situations, put yourself at some risk on appeal. Well, I don't think we happily took that, because we understood what he... You asked for it. Well, that's the construction that he gave based on the Markman hearing. At your behest, right? Not exactly. He created that himself. That was not our construction, the Markman hearing. What was your construction? Our construction on the Markman hearing was, first, that the member itself, there's a question as to how much, whether it had to be resilient at all, because that's not in the claims. But we accept that it has that... So you were arguing it didn't have to be resilient at all. You're making an even more aggressive argument. So that's not our position thereafter. And basically, the reason is, is that when we showed the evidence at trial that Dr. Tenser presented, that he came up with for orthorex, showed that this little device had 7 1⁄2 pounds of holding force, just attributed to resilience. In other words, that means you put it in a bone, and if you hang it upside down, you can hang 7 1⁄2 pounds on this, and it would still stay in the bone, only because of resilience. And the reason this is important in terms of the claim construction is because it meets the district court's claim construction, because it contributes. There may be other factors. It meets their construction on JOMOL, where it is part of what holds it in the bone, but not necessarily by itself is enough. Was this test done with the actual orthorex anchors? Yes, it was. With the ridges and so forth? Yes. And made out of plastic? The orthorex anchors, the actual anchors, are made out of plastic. I understand. The test was done with the plastic ridged, ribbed, I suppose, anchors. The real anchors, and in comparison with a steel anchor that they specially made up, which is the same shape, same configuration, same size. But the reliability of the test was disputed, was it not? Not by anyone that I'm aware of. They just failed to bring Dr. Tenser. They didn't bring him to trial. They admitted the reliability of the test? They said nothing about it. And that's the test we relied on. This holds 7 1⁄2 pounds. We then did our own set of tests doing the same thing and got the same results, and that was introduced at trial too. So the net result at trial showed this jury that this little thing, because of resilience alone, has 7 1⁄2 pounds of holding force. Of course, they say it's because of interdigitation, but I suppose your answer to that is that the steel comparative item would have had interdigitation. There's no reason to suppose that it would have had any less of that, and therefore the only difference has to be attributed to resilience. That's correct. You're exactly right. And so with those tests in mind, and that number in mind, their expert, Villaragua, said that in order to be ready to attach tissue to the bone, it requires 5 pounds as the minimum of holding power. So the net result here was that under the court's claim construction of contributing, it contributes. 7 1⁄2 pounds is a contribution. It's not infinitesimal. It's measurable. They measured it first, and then we measured it. Same results. The next thing was that under their construction for JMOL, where it has to be necessary but doesn't have to be enough to hold it by itself, well, 7 1⁄2 pounds is more than enough to hold it by itself. And their construction, according to Villaragua, their expert, next step is their construction here, which cannot be found anyplace else, Judge. You asked that question, can you find the construction there, certainly here, someplace else in the documents, and I can't find them. This is the sufficiency as opposed to necessary? Sufficiency by itself. To lodge it ready to attach tissue. There can be other factors, but it must be by itself enough. And under 7 1⁄2 pounds of holding force, it's enough by itself because the cutoff set by their expert is 5 pounds. So that's the evidence that we argued. That goes to the jury. There's no indication whatsoever that we actually argued at trial that infinitesimal is enough. That wasn't what the proof was. That wasn't the evidence we had going in. What we had going in was Dr. Tentz's test and Dr. Hayes' test that replicated that. But suppose we were to disagree with you and we were to conclude that you did argue that a minimal amount was sufficient. How do we know whether the jury relied on that line of argument or the line of argument that you're giving us right now, that 5 pounds was enough and the undisputed evidence was more than 5 pounds? Well, because if you're confronted with this, this evidence here, which clearly shows exactly how much it holds. It clearly shows that. It says, why would you think as a practical matter, well, it only has to hold infinitesimally. That's the only measure that was introduced in this case of measuring the resilience-holding power was those tests. Could I ask a question about obviousness before you run out of time? There's a lot of talk about figure 13 in aversio. In your brief, you argue that we can't properly consider figure 13 aversio. Let's suppose we disagree with you about that and we say, yes, we can consider figure 13 aversio. Does the combination of aversio and Perthes then include all the claim limitations? No, it does not. Which ones are missing? It does not lodge by precedent, which if you look at the entire... So why doesn't figure 13 show that? Because it can pull right out of the bubble. How do we know that? Because that's what's at least a fair inference from what is described in the aversio specification for how all these things work is that they can come out here. They're not held in the bone by pressing. And they're not held in the bone so that they can't come out. And that's the case with that. And what the problem is with that in particular is we totally lack any testimony by any expert in this case as to, at least for the purposes of summary judgment motion, as to how you make that combination. They said that there was no real issue about motivation to combine aversio and Perthes. Do you agree with that? No, I do not. Perthes at least... So if we concluded that all the limitations were present in the prior, there would still have to be a jury trial on motivation to combine. There would still have to be on that. Yes, that's correct. Because there was no testimony that showed anything like that. They just submitted the reference and argued that it was obvious in view of the combination. And what we have in that combination, as you know, judges, Perthes at least is a staple that's used in reattaching soft tissue to bone, whereas the Burgio thing is a little device that goes in the ear and holds an electrode. So there is a serious problem with that. Do you maintain that your client's entitled to the two-way test instead of the one-way test for obvious conduct of the patent? I do, Your Honor, yes. Your adversary asserts that if for no other reason you flunked that test because you failed to show that your client couldn't have had the claims in both of the patents in the same application, which is a requirement, and you don't respond to that. Well, we did. That's footnote 12 in their blue brief. Well, the connection with that is that... Well, don't you have to make it showing? If you're going to get a two-way test, you have to show that you couldn't have put the claims in one application? I think on the face of the patents here, we have two different total entities, inventive entities. It's Dr. Hayhurst on one patent, and this is a combination with Dr. Hayhurst on the other. The specifications of the two patents are totally different. But, you know, the allegation was made, the argument was made in footnote 12 in the blue brief, and you didn't respond to it. It's a little late to respond to an oral argument, isn't it? Well, I thought we had, but... You didn't. I see my time is up. Very well. Thank you, Mr. Skinner. Actually, I believe that since we are allocating an additional five minutes to Mr. Saber, that Mr. Skinner, if you had anything further, we won't hold you strictly to your 15 minutes. You have several additional minutes. If you want to use them, you should feel free to do so. Beyond this crossover? No. Are you going to reserve time for your cross-appeal? I was, but... I think you did have three minutes reserved. Right. Okay. Well, you can save that if the issue comes up in the argument that's made now. Then you can address the cross-appeal. Very well. Thanks. Mr. Saber. I'm going to try and be short if I can. Do address the five pounds and the seven pounds. I will. You're on. First, I want to answer your question from the first question they asked. Where did we say sufficiency? At least here's one place, which is at A010270, which was our brief and claim construction, where we said, in addition, Arthrex proposes that any resilient functioning of the anchor must be of a level sufficient to cause it to be lodged by pressing. So that's where we clearly said sufficient to lodge is our position on claim construction. With respect to what Mr. Skenyon said, who is a very, very skilled advocate, he wants to talk about the evidence. He wants to talk about the evidence. But the one thing that was clear is that his witnesses over and over again, talking about that evidence, said... Just to make sure we have the lay of the land right here, you would agree, would you not, that if the evidence is simply overwhelming and unanswerable, then it doesn't really matter what instruction was given to the jury. There's a harmless error argument. Of course. In the right case, there could be harmless error. Your argument is why this isn't the right case, and that goes to Judge Dyke's question. That's correct. That's correct. And I want to address... What he's saying, what your opposing counsel is saying, your witness has agreed that there needed to be 5 pounds and that the undisputed evidence was 7½ pounds. I can... There are so many ways to answer the question. Let me just try to give you... Let you try a couple. Let me just give you a few. Give me your best one to start with. First of all, their witnesses over and over and over again said all we were testifying is that that evidence that Mr. Skenyon referred to clearly shows a contribution in part. They never, ever once tried to say that that evidence showed that resilience was necessary or that resilience was sufficient. Never once. Wait, wait, wait. Did the jury hear the 7 pound? Did those words come out? They may have talked about the difference between the metal... 5 and 7? Well, I'll get to the 5 in a second. How about the 7? Was the 7 established? There was evidence that comparing the metal anchors, which, by the way, lodged without any resilience, that anything that there was on the average an extra 7 pounds... Well, a nail will lodge, even though metal typically has very low resilience. Right. And here, if it's going to lodge... The metal ones aren't the accused devices, right? No. I thought what they were doing was measuring the difference between the metal and the plastic or whatever. That's right. And they were saying that was 7 1⁄2 pounds, right? Here's what their own experts said about those tests, right? Do these tests, the very ones that Mr. Skenyon was talking about, do these tests quantify the amount of resilience that the anchors experience? Answer, no. Answer, no. They never took the position that this 7 1⁄2 pounds of extra resilience was any sort of test of being resilient, being necessary or sufficient to lodge the anchor. They said the exact opposite. What page? This is at page A23110. In fact, this is Dr. Proust. She said, to quantify that, the resilience, I'd have to be able to capture and measure the exact amount of energy that is stored and quantify the release. And she said, because it was so small, I can't do it. That's what happened at this case. Now let me talk, if I may, for a moment about the 5 pounds. That is not what our experts said. What our experts said when asked a question, well, how much force do you need to lodge? And she said, I've seen literature between 5 and 20, and they said, what does it depend upon? It depends upon the nature of the bone and how hard you pull. She never said 5 pounds, by the way. She said 5 to 20 is a range, depending upon lots of other factors. So if you wanted to take that, it's really, she's saying, if you want to make sure the thing works, she's saying 20. So that was her testimony on the 5, but more importantly, it's apples to oranges, because their own experts say this is not a test to show whether this is enough force on resilience to lodge. They said it's not. And that's the principal reason why under no circumstances can there be, could this be a harmless error. And of course, you know, the last thing I want to say on that is exactly what you said, Judge Dyke. They told the jury there was a big dispute in this case. Our experts were saying there's no resilience at all or any resilience that's there is just the natural thing that happens with anything. You have to realize we're talking about hard plastic that's being pounded in. These aren't the resilient legs like in this patent. And Arthrex said that's not resilience at all. They said any small amount, even if you believe Arthrex, that's what they're saying, any small amount is enough. And that's why. Did your witnesses run tests on resilience? Our witnesses did tests to describe what the product was like. They didn't do the kinds of tests that, well, he's correct that Dr. Tenzer, who wasn't there. If he wasn't there, we don't care. It wasn't part of our case. Our case was really talking about what these anchors are. Remember, these anchors are very, very, very different. They're anchors that are pounded in. These aren't anchors. We know what resilience is when you're using a device which is going to collapse. I thought there was evidence that the anchors, correct me if I'm wrong on this, I thought there was evidence that the anchors were actually softer, i.e., more resilient than the bone that they were going through, at least the outer. The cortical bone, I think they had some evidence on that. So you would expect that there would be compression, assuming that the hole is smaller than the anchor, which it would be if you're pounding it in, you would assume there'd be compression from the anchor disproportionate to the compression of the bone. Not necessarily, because really what was happening as it went through the cortical layer is it's actually breaking the cortical layer up. So it's not necessarily compressing. And if they did, we're talking about very, very, very small... The resilience is in the lower soft layer. That's what... When you get into the soft layer, they say... I mean, that's where the legs come out. That's exactly right. But the force, even if the compressed item is not actually expanding, indeed, especially if it's not expanding, the force is still as great. That's the resilient force that holds it in. The thing that was going through, of course, was breaking apart. It was breaking apart. What happens when it gets into the cortical layer, this is what our case was about, when it gets into the cancellous layer, is what happens is because that's softer, it fills in those ridges. This is what was sometimes referred to as geometry or interdigitation. That's what we say is the thing that lodges the anchor. And that is because of the geometry of the ridges? Because of the geometry of the ridges... But the geometry of the ridges was true in the metal equivalent of your plastic anchors that was used in the test, right? So, presumably, the interdigitation would have been the same in both, and yet there were different results with the plastic and the metal anchor. What's the explanation for that in your view? First of all... In light of the... If you want to really talk about the evidence... Well, we can come down to that. The evidence in the case, Your Honor, actually, when we got to that very question, some tests came out the metal was harder to pull out, some came out the plastic was harder to pull out. So the tests are all over the place. In fact, even again, they're experts talking about these tests that say this doesn't really replicate what happens in bone, because everyone's bone is different. You know, it's the best you can do as some piece of evidence. And, you know, we're not contesting the evidence in this case, because we know under the standard that that's not where we're coming from. But our case was about interdigitation. In fact, that's what the evidence showed, is that the metal was the interdigitation. And any extra force, even if it was that, is very, very different than the force that would be necessary to come in. In fact, that force is immeasurable, Your Honor, which is why we believe, in fact, we're entitled to judgment. Thank you very much. And thank you, Mr. Skinion. I sense there was no reference to the cross-appeal issues when the case was submitted. Thank you both.